CITY OF CAMBRIDGE *vs.* BOSTON ELEVATED RAILWAY
COMPANY.
BOSTON ELEVATED RAILWAY COMPANY *vs.* SUPERINTENDENT
OF STREETS OF CAMBRIDGE.

Middlesex. Suffolk. March 17, 1922. — May 18, 1922.

Present: RUGG, C.J., BRALEY, DE COURCY, & JENNEY, JJ.

*Department of Public Utilities. Boston Elevated Railway Company. Municipal Corporations. Public Officer.*

The Commonwealth exercises its sovereign power in the granting of locations for the operation of street cars through such instrumentalities as the General Court may designate, and they, when so designated, become public officers for the carrying out of such purpose.

The public function of granting locations for the operation of street cars may be taken by the General Court from one board of public officers and vested in another upon considerations of general welfare alone, and no municipality has legal ground for complaint as to such legislative action.

The granting to the Boston Elevated Railway Company by the department of public utilities under Spec. St. 1917, c. 373, Part III, § 6, of locations for street railway tracks in Third Street and Bridge Street near Lechmere Square in Cambridge, in connection with the establishment of an enclosed area or station near Lechmere Square for the transfer of passengers between trains operated through the subways and over elevated structures and surface cars operated on streets throughout the system maintained by that corporation, instead of choosing a location through Second Street, nearer to Lechmere Square, was within the power conferred upon that department by the statute.

The purpose of the Legislature in enacting Spec. St. 1917, c. 373, was that an order of the department of public utilities entered therein should measure the rights and obligations of the Boston Elevated Railway Company and that that corporation should not be subject also to ordinances of local municipalities.

Upon the issuance of an order by the department of public utilities under Spec. St. 1917, c. 373, Part III, § 6, granting a petition by the Boston Elevated Railway Company relative to the establishment of an enclosed area or station near Lechmere Square in Cambridge for the transfer of passengers between trains operated through the subways and over elevated structures and surface cars operated on streets and the locations for tracks in Third Street and in Bridge Street in connection therewith, the company did not need any permit or license from officers of the city of Cambridge to proceed with the work of construction in city streets rendered necessary in order to comply with the order; and therefore a bill in equity by the city of Cambridge, seeking a decree enjoining the corporation from proceeding to avail itself of the permission given by that order because the superintendent of streets, acting under ordi-

nances purporting to give him necessary power, had refused to grant the corporation leave to make the location, as well as a petition by the corporation for a writ of mandamus directing the superintendent of streets to grant such leave, must be dismissed.

BILL IN EQUITY, filed in the Superior Court on December 20, 1921, seeking to enjoin the defendant from interfering with the surface of Third Street, a public highway in Cambridge, and from laying tracks therein; also a

PETITION, filed in the Supreme Judicial Court on January 6, 1922, for a writ of mandamus commanding the superintendent of streets of Cambridge "to issue to your petitioner permits to open, occupy, obstruct, encumber, and use such parts of Third Street, Cambridge Street, Bridge Street, Gore Street, and Kelley Square in Cambridge as are reasonably necessary in order to lay tracks and set poles upon the locations granted by said order of the Department of Public Utilities and to do the other work authorized by said order, or to take such other action as the court shall deem fitting in the premises."

In both the suit in equity and the petition for a writ of mandamus, there were agreed statements of facts. Material facts are described in the opinion. The suit in equity was reserved by *Sanderson*, J., for determination by this court. The petition for a writ of mandamus was heard by *Crosby*, J., who found that the locations granted by the order of the department of public utilities, a copy of which was annexed to the petition, were required for the purposes of Spec. St. 1917, c. 373, Part III, ruled that, so far as the issuance of the writ was within the discretion of the court, the writ should issue, and reported the case to the full court for determination.

*H. W. Barnum,* (*C. W. Mulcahy* with him,) for the Boston Elevated Railway Company.

*P. J. Nelligan,* for the city of Cambridge and the superintendent of streets of Cambridge.

RUGG, C.J.    The city of Cambridge brings a suit in equity to restrain the Boston Elevated Railway Company from constructing its tracks in Third Street, a public highway within that city, and tracks connecting therewith. The Boston Elevated Railway Company brings a petition for a writ of mandamus to compel the superintendent of streets of the city of Cambridge

to issue permits or licenses to the railway company to open, use, occupy and encumber parts of Third Street and certain other streets for the purpose of laying tracks and setting poles in accordance with a location granted to it by the department of public utilities. Each case is reserved for our determination upon the pleadings and an agreed statement of facts.

The Boston Elevated Railway Company, hereafter called the company, is the chief, if not the only, common carrier of passengers by means of street cars in Boston, Cambridge and numerous other nearby cities and towns, operating tracks and cars in the streets of all these municipalities. Its operation is of so much public concern that it has been taken over by a board of public trustees under Spec. St. 1918, c. 159. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 414. An average of approximately nine hundred thousand passengers are transported daily on its lines. It operates as lessee the subways in Boston and Cambridge. It owns and operates an elevated railway structure in Cambridge, which connects with the Boston subways on the Boston end and on the other, near Lechmere Square in Cambridge, with surface tracks diverging over divers routes in public ways in Cambridge and Somerville. It also operates an elevated railway structure in Boston and surface cars in other cities and towns. For some years there have existed during morning and evening rush hours undesirable congestion and crowding of passengers at the Park Street subway station in Boston and on some surface lines, although practically as many cars were operated as possible under existing arrangements and methods. By cars coupled in trains of three or four cars each nearly three times as many cars can be operated over the same tracks in a given time as by single cars.

"An Act relative to the property, service and capitalization of the Boston Elevated Railway Company" is the title of Spec. St. 1917, c. 373. Part II of that act is designed to enable the railway company to provide additional cars and to improve its service, and Part III to authorize it to establish enclosed areas, stations or shelters for the convenient transfer of passengers. It is provided in § 6 that "The company may, to the extent and in the manner in which the public service commission, after notice and a public hearing, may approve, establish in and upon

public and private ways and lands in connection with any lines of railway, or elevated railway station or terminal now or hereafter owned, leased or operated by it, suitable enclosed areas, stations or shelters with approaches, tracks, poles, wires and other structures and connections with existing stations, terminals, tracks and wires, all hereinafter called appurtenances, for the convenient transfer of passengers between surface cars and elevated railway stations or trains, or between surface cars; but the work of construction thereof shall not be begun before plans have been approved by said commission showing the general form and method of construction, the extent to which any public or private way or land is to be occupied, and the extent to which public ways or places are to be laid out, widened, altered or discontinued." The board of public trustees operating the company determined that its transportation service would be substantially improved by the establishment of an enclosed area or station near Lechmere Square in Cambridge for the transfer of passengers between trains operated through the subways and over elevated structures and surface cars operated on streets. Accordingly a petition to that end was presented to the department of public utilities, the legal successor of the public service commission. After due proceedings, the department of public utilities sanctioned the establishment of an enclosed transfer area or station near Lechmere Square for surface and elevated lines of the company, approved plans therefor, and granted locations to the company for tracks, poles, wires and incidental railway structures in and upon Third Street and Bridge Street amongst other streets in Cambridge. No contention is raised concerning the location of the transfer station or any of the tracks immediately centring there. The controversy relates to the location of tracks in Third Street and of a connection in Bridge Street. It is contended that these locations are invalid because beyond the power of the department of public utilities under the statute. That contention is founded on the fact that between the transfer station and Third Street, parallel to the latter, lies Second Street, a public highway, and that it would be physically possible to grant a location and construct connecting tracks in Second Street and thus be considerably nearer the transfer station. As bearing upon the feasibility of this connection through

Second Street, there was testimony at the hearing before the department of public utilities, agreed to be treated as evidence in the cases at bar, to the effect that it would be impossible to construct and operate the Lechmere Square transfer station with tracks upon Second Street without taking several additional parcels of real estate with dwelling houses thereon, and although a station could physically be constructed, it could not be operated during rush hours without congestion and delays which would impair the service furnished to the riding public. Connections between tracks in Bridge Street and those in Cambridge Street are necessary in order to permit the looping of surface cars entering the station, and such connecting tracks ought to be at a sufficient distance from the station to prevent congestion of cars within the terminal, and that during rush hours it would not be possible to operate the station if such connecting tracks were as near as Second Street.

There is nothing to indicate the reasons which moved the department of public utilities to grant the location in Third Street rather than in Second Street. It is, however, open to fair inference that this testimony may have been believed or have been in accord with their own judgment and thus formed the basis for their order.

The granting of locations for the operation of surface street cars is the function of public officers. The State puts forth its sovereign power in that particular through such instrumentalities as the General Court may designate. Boards of aldermen of cities or selectmen of towns in passing upon such matters are not agents of municipalities but are public officers. The function of granting such locations may be taken from one board of public officers and vested in another upon considerations of general welfare alone. Of such legislative action no municipality has legal ground for complaint. *Hyde* v. *Boston & Worcester Street Railway*, 194 Mass. 80, and cases there collected. *Cheney* v. *Barker*, 198 Mass. 356. *Board of Survey of Arlington* v. *Bay State Street Railway*, 224 Mass. 463.

The granting of the location in Third Street rather than in Second Street, with the necessary connections, was within the power conferred upon the department of public utilities by the statute. The controlling consideration is the accommodation

of the public in connection with the transfer station. Within rational limits whatever approaches, tracks and connections with existing tracks are found to be preferable in the light of all the circumstances for the convenient transfer of passengers, may be ordered by the public board. Elements of expense properly may be considered. That a fire house or other municipal buildings may be upon Third Street, are simply factors to be given such weight as may be thought wise as part of the large problem of public transportation. The order made was well within the authority vested in the department of public utilities. *Boston* v. *Boston Elevated Railway*, 213 Mass. 407.

The scope of Spec. St. 1917, c. 373, makes clear the purpose of the Legislature that the order of the department of public utilities shall measure the rights and obligations of the company, and that it shall not in addition be subject to local ordinances. The provisions of § 6, to the effect that work of construction shall not be begun until plans shall have been approved by the department of public utilities bears the implication that when so approved work may proceed. By § 7 streets may be laid out, altered, widened, discontinued or changed in grade on approval of the department of public utilities, and work shall be performed by the company. By § 8, on like approval tracks, conduits, pipes, wires, poles or other property of other corporations located in public ways must be removed altogether by the company or placed in other locations designated by the department of public utilities. The company is required also to indemnify cities and towns against all liability for damages arising out of the work authorized under the act upon notice of claim and opportunity to defend. All these provisions import finality and are inconsistent' with the right of a municipality to add other, different or more onerous conditions concerning the same subject. The provision in § 10 that the act shall not be deemed to abridge the powers of the Boston transit commission under named statutes imports that powers of other public bodies are abridged, so far as necessary, in the practical interpretation of the act.

These provisions of the statute render the decision in *New York Central & Hudson River Railroad* v. *Cambridge*, 186 Mass. 249, apposite to the facts disclosed on the present record. It was held in that case that the ordinance of the city of Cambridge,

here invoked by it, was inoperative as to the work done by a steam railroad in the repair and maintenance of its crossing with a highway at grade. The reasoning of that opinion is equally applicable to the present cases. The Legislature by the special statute has intervened and in substance and effect declared that the conditions and regulations embodied in that act and the order of the department of public utilities supersede local ordinances as to the right of the company to open streets so far as necessary to perform work authorized pursuant to the terms of the act. It is unnecessary to review in detail the provisions of the city ordinance. Many of them are set out in *New York Central & Hudson River Railroad* v. *Cambridge, supra.* It is manifest that the statute enacted for the purpose of facilitating rapid transit for the general public in the district in and around Boston is designed not to be hampered in its operation by local ordinances.

The company does not need any permit or license from officers of Cambridge to proceed with the work of construction in city streets rendered necessary in order to comply with the order of the department of public utilities. *Boston Consolidated Gas Co.* v. *Department of Public Utilities,* 235 Mass. 590, 598. It follows that in the suit in equity decree may be entered dismissing the bill with costs and that the petition for writ of mandamus is denied.

*So ordered.*